**Shirley DEAN, Karen Gardiner, LaVonne Anderson, Deborah Michalik, Lucille Rife, Denise Loftus, Plaintiffs,**

v.

**A.H. ROBINS CO., INC., Defendant.**

Civ. Nos. 3–82–698, 3–83–1025, 3–80–419, 3–83–1060, 4–84–51 and 4–84–70.

United States District Court,
D. Minnesota,
Third and Fourth Divisions.

Feb. 8, 1984.

Dale I. Larson, Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., for plaintiffs.

Jack M. Fribley and Mary Trippler, Faegre & Benson, Minneapolis, Minn., for defendant.

## ORDER

MILES W. LORD, Chief Judge.

On December 12, 1983, pursuant to an arrangement by the judges of this district, 20 Dalkon Shield cases filed against the A.H. Robins Company were assigned to this judge for trial. Some of these cases had been pending for upwards of three years. To move the cases forward in an expeditious and economic manner, this court ordered these actions consolidated for trial on the generic issues. While defense counsel objected to this procedure, they did represent that they would abide by the court's request to work with a cooperative spirit to resolve any problems that might arise. Thereafter, plaintiffs' attorneys dis-

closed to the court that they had received new information relevant to the testimony of certain company officials who had been deposed years earlier and that it was necessary to update their statements. This spawned a round of depositions of company officers, which in turn led to the identification of newly-discovered documents. The issue now before this court is plaintiffs' motion to compel discovery of these materials.

This order will define which documents must be produced by A.H. Robins. But before outlining the parameters of this production, the court finds it necessary to set forth in some detail the exceptional events which have led up to this order.

Plaintiffs' attorneys began taking depositions of A.H. Robins officers in mid-January at the company's headquarters in Richmond, Virginia. These depositions progressed at an exceedingly slow pace, primarily because of the deponents' difficulties in answering even the most basic of questions due to lack of recollection.

On January 23, 1984, plaintiffs' attorneys initiated a conference call to this court in which all parties participated. (Although the court had so requested, some such conference calls were not made of record. The existence or nonexistence of a record concerning this particular call is unknown by the court at this time). Plaintiffs' attorneys informed the court that the deposition of board chairman E.C. Robins Sr. was stalled by his inability to recall any conversations with top company officers concerning the Dalkon Shield. Robins Sr. did state that his recollection would be refreshed by minutes of the company's board of directors meetings; the company, however, refused to provide those minutes.

This court, during the phone conversation, ordered that the board minutes be produced. Company attorneys did subsequently prepare excerpts of the minutes, photocopying those portions which dealt with board discussions of the Dalkon Shield. The defendant claimed, however, that certain references to the product in the minutes were privileged. This court therefore ordered that the entire minute books be produced in Minneapolis for an *in camera* inspection.

The court reviewed the minute books in chambers on January 25. The minutes revealed that both Robins Sr. and his son, chief executive officer E.C. Robins Jr., not only attended nearly every board meeting during their tenures in office but also demonstrated a detailed knowledge of the corporation's affairs. These were crucial revelations, given the fact that both of these officers claimed lack of knowledge due to both poor recollection of events and limited participation in the concerns of the company.

The minute books also opened the door to another pertinent line of discovery. Mentioned in the minutes—but deleted by defense counsel from production to the plaintiffs—were periodic reports from Roger L. Tuttle, who directed the company's defense of the Dalkon Shield in the 1970s. These reports were addressed to the company's top management, and therefore also bore on the knowledge of officers undergoing depositions.

As this *in camera* review of the minute books concluded, the court received another conference call from attorneys participating in the Richmond depositions. Again, the court heard the complaints from plaintiffs' counsel of delay by deponents. The court inquired whether it would be helpful for it to fly to Richmond to facilitate the depositions. A trip to Richmond would also give the court an opportunity to review *in camera* the Tuttle reports, which were not available in Minneapolis. Neither party objected to the court's suggestion. In fact, each side agreed to pick up the travel costs of a law clerk, and defense counsel made the plane and hotel reservations.

The scene in Richmond the next day, January 26, was far from conducive to orderly court proceedings. The depositions of Robins Sr. and former company officer Dr. Fred A. Clarke Jr. were being conducted at the company's insistence in its own headquarters. Company employees milled

about, leaving plaintiffs' attorneys no privacy in which to confer with each other. Live microphones further intruded on any discussions between the plaintiffs' attorneys. Chairs were positioned so that attorneys for the deponents sat shoulder-to-shoulder, knee-to-knee with their clients; a nudge by an attorney could—and did—silence the deponent without anyone else in the room picking up the signal. The deposition room itself was small and poorly ventilated. Heat from lights used to videotape the depositions raised the room's temperature to more than 80 degrees.

Yet this was the environment in which the company chose to conduct the depositions of two of its officers, both of whom were suffering from heart disease. When the court suggested that the depositions be moved to the quiet and calm of the Richmond courthouse, the company objected and resisted.

These were not the only matters which made the court's task in Richmond most difficult. The company, after acquiescing to the court's intention to proceed in Richmond and specifically waiving any objections to the court's powers in the State of Virginia, recanted in the middle of the two-day trip and objected to the court's jurisdiction. This thwarted any further work to move along document production at a time when the court was on site at the Richmond headquarters and in a perfect position to oversee and facilitate discovery.

The proceedings thus shifted back to Minnesota. Since then, on at least a daily basis—and often several times in a single day—the plaintiffs' attorneys have reiterated in oral arguments and written submissions their requests for discovery. The plaintiffs have refined their demands, stating with particularity that which they seek. The plaintiffs have outlined the purposes for which they seek the documents: refreshing the recollection of deponents, impeaching previous testimony, supporting the liability claims. The court has gone over the matter time and time again. The pattern is the same: the defendant either appears to accept the court's orders with-

out objection and then fails to abide by them, or recoils at the slightest hint of a new directive and asks for additional time to prepare its response. This lends much credence to the plaintiffs' claim that the company's nationwide strategy in defending the thousands of Dalkon Shield cases against it is to wage a "war of attrition": prolonging and protracting the litigation so as to wear down its opponents without giving them a fair opportunity to have their suits heard. (Defendant likewise denounces the conduct of plaintiffs' attorneys in other cases.)

Another defense tactic also has made it most difficult for these proceedings to go forward in an expeditious manner. The defendant has employed a great number of attorneys in these proceedings. This by itself is quite understandable, given the stakes here involved. However, what is absolutely unacceptable is the defendant's practice of obscuring the responsibility of its attorneys so that it is impossible to determine at any given moment who is accountable for representations made to the court. The defendant also has rotated its attorneys in and out so that the court must start up from ground level over and over in order to brief the new arrival.

The following example serves to illustrate this problem. When the court returned from Richmond with summaries of the Tuttle reports, the defendant promptly filed a brief objecting to the production of these "privileged" excerpts. (These summaries were prepared in Richmond by the court's law clerks, who were instructed to excise any material that might possibly be privileged. Thus, the material produced in the summaries contained merely the names of the addressees, the author, and the number and nature of Dalkon Shield claims discussed in the reports.) Defendant's brief did not appear to recite the facts with any degree of accuracy. Upon inquiry, local defense counsel stated that although he signed the brief he had never read the documents toward which it was directed and that he did not know who had written the brief. He stated that he had received

the brief from Richmond. The court received the same response from the defense counsel from Richmond. It thus appeared to the court that it was receiving briefs about matters which were not even within the purview of the knowledge of the people who were representing A.H. Robins in court.

Other courts have noted these "shell game tactics" of A.H. Robins. *See A.H. Robins Company v. Devereaux*, 415 So.2d 30, 32 (Fla. 3d D.C.A.1982). This court tried to remedy the situation by demanding that out-of-state attorneys sign oaths promising to abide by and be subject to the same rules of ethics as all Minnesota attorneys. The defendant's attorneys balked at this directive, and spent at least two days of court time objecting. (It appears that the major stumbling block to the signature of such an oath might have been the habit of defendant to require that plaintiffs' counsel when settling a case agree to not handle any further Dalkon Shield actions.) Finally, a watered-down version of this oath was agreed to, and it was agreed that each attorney who worked on a brief or presentation to the court would sign the document.

The record further demonstrates the occurrences which underlie this discovery order. On January 30, the court conferred with the parties about specific document requests. On January 31, at the request of the defendant, the plaintiffs submitted in writing a detailed list of their discovery demands. On February 1, the plaintiffs again requested the production of the documents and stated the reasons for their requests. On February 2, discussions continued concerning the magnitude of the discovery requests and the difficulty in handling them; the court's reluctance to familiarize itself with allegedly privileged documents prompted it to suggest that a master be appointed to handle the assignment of sorting through materials. On February 3, there were further conferences with the court over the details of discovery.

Finally, on February 6, the court pursuant to the local rules of practice required the parties to confer with respect to the proposed language of this order defining the categories of documents to be produced. The court on that date worked through the specific language with the parties.

The next day, February 7, the court signed an order appointing two masters and delineating their responsibilities in the production of documents. On this date, the defendant came forward with three objections to the proposed order. The court gave many of its reasons for overruling these objections during the hearing, as will be reflected in the record. However, for the sake of completeness, the court here will deal briefly with these objections.

First, the defendant objects to this discovery as a "direct assault" on the attorney-client and work product privileges. This argument is, at best, premature. The court is scrupulously protecting these privileges at this stage of the proceedings. The sole endeavor at present is to identify and accumulate the specified documents and segregate them into privileged and nonprivileged categories. Many of the documents sought deal with the issue of insurance coverage. These are clearly subject to discovery under Rule 26(b)(2), Fed.R.Civ.P.

Second, the defendant objects to the discovery because it claims the plaintiffs do not have a proper purpose in seeking this evidence. The defendant, however, misstates the aims of plaintiffs. As repeatedly amplified in the record, the plaintiffs are seeking this material on the issues of notice, knowledge of defect, general liability, and punitive damages. In this court's judgment, these documents may well bear upon all of those issues.

Third, the defendant objects to this discovery as being overly burdensome and oppressive. It is true that this has been a much-discovered case, for nearly a decade now. It is also true that the defendant has been subject to discovery conducted pursuant to the multidistrict litigation proceedings. However, despite all of this previous discovery, the documents presently sought by plaintiffs have never been produced. *Indeed, defendant's counsel admitted*

*that many of these sought-after files have never been reviewed for nonprivileged material, notwithstanding the fact that the files likely contain information that would have been responsive to previous discovery requests.*

The defendant consistently raises the argument that there can be no further discovery because the multidistrict litigation has exhausted all such activities and foreclosed further endeavors. This court's review of the law and its experience in multidistrict litigation matters causes it to conclude that the plaintiffs have made a showing of good cause for further discovery. The multidistrict litigation proceedings and their very helpful accumulation of evidence are not to be used by the defendant as a shield against further discovery when such new evidence is relevant, cogent and essential. This court has conferred by telephone with Judge Frank Theis, who headed the multidistrict proceedings. The court's conversation with Judge Theis, and the reading of his orders, give little comfort to the defendant in this regard. Judge Theis chose to let each local jurisdiction handle the trial of its own Dalkon Shield cases after he conducted some pretrial proceedings. The further processing of these cases therefore became a matter to be decided by the local district courts.

The defendant's objections as to the magnitude of this order also must be viewed in the context of A.H. Robins cases nationwide. There are more than 3,000 lawsuits pending against A.H. Robins, excluding cases on appeal. The defendant and its insurance company have spent approximately $70 million in legal expenses. This additional discovery will aid the resolution of all of these outstanding cases, and it is not so drastic an undertaking when considering the massive scope of the litigation.

Accordingly, pursuant to Rules 16, 26 and 34 of the Federal Rules of Civil Procedure and Rule 611 of the Federal Rules of Evidence, IT IS HEREBY ORDERED That:

A.H. Robins shall produce all documents in the following categories to the court as soon as possible, the exact date of production being dependent upon the report of the two masters ordered to assist the court in this regard. Each document shall be numbered immediately. Within each of these categories, documents shall be segregated between those to which any claims of attorney-client or work product privileges are asserted and to which a protective order may be required, and those documents for which no such claim is made. The categories of documents to be produced are as follows:

A. All documents containing opinions, reports of tests, reports of examinations, or reports of studies concerning the safety or characteristics of the Dalkon Shield which were directed or supplied to or received by William A. Forrest, Jr., during the period from June 1, 1974, to the present and for which defendant claims work product or attorney privilege;

B. All documents not included in A above, regarding the Dalkon Shield which have been directed or supplied to or received by William A. Forrest, Jr., during the period June 1, 1974, to the present;

C. All documents containing opinions, tests, examinations or studies concerning the safety and characteristics of the Dalkon Shield authored by present or former employees of the A.H. Robins Company from June 1, 1974, to the present which documents are in the possession or under the control of A.H. Robins, its attorneys or others presently under the control of A.H. Robins or its attorneys;

D. All documents now in the possession of A.H. Robins or persons under the control of A.H. Robins including its attorneys containing opinions, tests, examinations or studies concerning the safety and characteristics of the Dalkon Shield which have been directed or supplied to present and past employees of the A.H. Robins Company from June 1, 1974, to the present and authored by consultants or experts retained on behalf of the A.H. Robins Company by the company itself or its representatives including counsel;

E. All documents containing opinions, tests, examinations, or studies concerning the safety of the Dalkon Shield directed to William A. Forrest, Jr., authored by William A. Forrest, Jr., or received by him and which were also received by any of the following individuals in any capacity during the period June 1, 1974 to the present:

E.C. Robins, Sr., Chairman of the Board and former Chief Executive Officer.

E.C. Robins, Jr., who is now Chief Executive Officer.

William Zimmer, who was once President.

W. Roy Smith, Senior Vice President, retired.

Jack Freund, Vice President, retired.

Fletcher B. Owen, Director of Medical Services.

Ellen Preston, Medical Doctor.

Dr. Notterbart, Medical Doctor.

Richard Velz.

F. All documents containing opinions, reports of tests, examinations or studies concerning the safety or characteristics of the Dalkon Shield and/or review of individual patient files authored by Drs. Owen or Notterbart for the period June 1, 1974, through the present;

G. All correspondence, memoranda or other documents received or prepared by A.H. Robins or its representatives concerning the underwriting (purchase, cancellation, termination or analysis of past or future claims or premiums) applicable to the insurance or self-insurance of Dalkon Shield claims;

H. All correspondence, memoranda or other documents received or propounded by A.H. Robins or its representatives concerning either partial or complete denials of coverage (or reservations of rights to deny coverage) by Aetna Casualty and Surety Company concerning Dalkon Shield claims;

I. All correspondence, memoranda or other documents exchanged between Aetna and A.H. Robins concerning the safety or characteristics of the Dalkon Shield, the warning of Dalkon Shield hazards, dangers of defects or the recall of the Dalkon Shield at any level of distribution;

J. All opinions, tests, examinations or studies regarding the safety of the Dalkon Shield and authored by experts or consultants retained in any of the individual lawsuits initiated against the Robins Company for the period June 1, 1974 to the present.

In the event that these discovery requirements impinge upon the trial of this matter, the court will consider at the request of either party a motion to grant a continuance or to declare a mistrial until such time as discovery is completed.

Defendant's motion for a stay of this order and further discovery is denied.

IT IS SO ORDERED.